UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
DANIEL SCHUBMEHL and KEVIN WOODS, on
behalf of themselves and others similarly situated,

                              Plaintiffs,

v.

SARMA MELNGAILIS, ONE LUCKY DUCK HOLDINGS,
LLC, PURE FOOD AND WINE, LLC, CGM 54 IRVING, LLC,
d/b/a PURE FOOD AND WINE, and ONE LUCKY DUCK
ECOMMERCE, LLC, jointly and severally,

                              Defendants.
-------------------------------------------------------------------------x

15 cv 6432 - VEC

AFFIDAVIT OF DANIEL
SCHUBMEHL

State of New York   )
                          ) ss.:
County of New York )

DANIEL SCHUBMEHL, residing at 752 Franklin Avenue, Apt 4, Brooklyn, 11238, being duly sworn, deposes and says:

    1.    I was an employee of Pure Food & Wine for eight years, beginning in 2006.

    2.    Pure Food & Wine was a restaurant located at 54 Irving Place, New York City and was owned by Sarma Melngailis.

    3.    Pure Food & Wine was a vegan and raw restaurant and was once rated as a Forbes Top 100 restaurant.

    4.    Throughout my employment with Pure Food & Wine, the owner, Sarma Melngailis, had the authority to schedule employees, wrote checks, and was in charge of the general operation of the restaurant. When she was not physically present in the restaurant, she would direct her managers to take care of those things via telephone and email correspondence.

    5.    I was originally hired by Melngailis after I interviewed with her in 2006.

6. My duties at Pure Food & Wine included waiting tables, customer service, bartending, and wine ordering.

7. I am also familiar with the sales that the restaurant made on a nightly basis. As bar tender I would I would enter the end-of-day sales figures into a spreadsheet on the Company's computer. On average, the restaurant made about $15,000.00 per night in gross sales, including sales made during lunch.

8. Melngailis is also the owner of One Lucky Duck – a juice bar that was on the same premises as Pure Food & Wine, but that offered prepared food and juices for takeaway customers.

9. Melngailis also owned an e-commerce website that used the tradename One Lucky Duck (www.oneluckyduck.com) and was operating out of a warehouse in Brooklyn where employees prepared packaged food and shipped orders of food and cosmetics to customers.

10. Employees at all of the defendant companies were paid by check or direct deposit. I know this to be true by first-hand knowledge. Wages were paid on a weekly basis, when they were paid at all. Payday was on Thursday of each week.

11. All tips, cash and credit card, were pooled and paid to tipped employees in their paychecks. Cash tips were turned over to the managers as they came in during each shift and were recorded in the company's computerized records.

12. I was paid at a rate of $7.00 per hour as a waiter and bartender, plus tips through my participation in the tip-pool.

13. Tips varied throughout the year, from season to season, but typically averaged about $25.00 per hour for tipped employees.

14. Waiters, bartenders, bussers, runners and hosts participated in the tip pool.

15. The remaining classifications of employees did not participate. Those include line cooks, expeditors, chefs, pastry chefs, porters, dishwashers, managers and those employed at the e-commerce facility in Brooklyn.

16. When I did ordering of wine for inventory for approximately three hours per week, I was paid at a rate of $30.00 per hour.

17. I was a plaintiff in a lawsuit against the same defendants in January of 2015 after Melngialis suddenly stopped paying employees and payroll checks began to bounce. That case was ultimately settled and many of us went back to work for Melngailis in April of 2015 when the restaurant reopened.

18. On or about June 15, 2015, checks started bouncing again and we learned that there was inadequate money in the company's bank accounts to satisfy payroll. I know this was also the case at the juice bar and e-commerce facility.

19. Melngailis promised us that if we kept working, she would find the money to pay us.

20. Between June 15, 2015 and July 2, 2015, the defendants failed to pay us on time for all wages and tips.

21. During the last week of operation, some of the cash tips were used to pay the tipped employees, in part, because the managers were concerned that Melngailis would not have enough money in the company's account for payroll.

22. On July 3, 2015, the restaurant closed suddenly and has not reopened since that time.

23. At the time of closure, and to this date, defendants have not paid any employees for the work performed between June 22, 2015 and July 2, 2015.

24. I have reviewed the payroll journal that was given to my attorney by Asparagus Trading Company and believe it is accurate as to the names of the individuals who were working for the various companies during the last week of their operation. Between all of the companies, there are approximately 83 individuals who were not paid for the work they performed for the defendants.

25. To the best of my knowledge, no one has heard from defendant Melngailis since the first week of July, 2015.

26. The individuals who have opted into this lawsuit as of the date of this affidavit are mostly people who kept in touch via email and social media. I do not have the contact information for the majority of the people listed on the payroll journal that was provided to my attorney.

27. I helped to circulate a form for my coworkers to participate in the lawsuit, but have only been able to reach those individuals for whom I have cellphone numbers, email addresses, or social media contact information.

28. I know that most people who worked for defendants were not high wage earners. Many had to find other work immediately following July 2, 2015 because of the severe hardship they endured after not being paid for weeks of work. I heard some of my coworkers say that they were unable to pay their rent and other bills.

29. The company and Melngailis' failure to pay wages for the period of June 22, 2015 through July 2, 2015, impacted all the employees that worked for the various companies listed as defendants in this action. I know this because we all talked about the bouncing checks and the fact that we did not receive our wages for that period. Specifically, I know that the individuals

that have opted-in to this action as of the date of this affidavit were damaged by defendants' failure to pay wages for the period of June 22, 2015 through July 2, 2015.

30. While some of the information on the payroll journal does not make sense to me (the rates and net payments), the number of hours worked appears to be correct. I believe that the amounts owed to me and my coworkers could be calculated by using the information contained in the payroll journal.

31. During the course of my employment with defendants, I have observed that the conditions of work, including method and frequency of payment, were similar for all employees of the defendants in this case, including those that have opted in to this action as of the date of this affidavit. Specifically, defendants failed to pay wages to the individuals who have opted-in to this case for the period of June 22, 2015 through July 2, 2015.

WHEREFORE, it is respectfully urged that the request for conditional certification of a representative class be granted.

_____
DANIEL SCHUBMEHL

Sworn to before me this 19th day
of April 2016

_____
NOTARY PUBLIC

BENJAMIN NATHAN DICTOR
Notary Public, State of New York
No. 02DI6296798
Qualified in New York County
Commission Expires Feb. 10, 20_18_

—5—